UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:23-CR-90-SNLJ-ACL |
| | ) |
| TIMOTHY DRAKE, | ) |
| | ) |
| Defendant. | ) |

# REPORT AND RECOMMENDATION

Before the Court[1] is Defendant Timothy Drake's Motion to Suppress Evidence. (Docs. 23, 32, 38.) The Government opposes the Motion. (Docs. 25, 37.)

On June 5, 2023, Defendant Timothy Drake was stopped for driving without his taillights illuminated. After the stop, it was determined that Drake was driving a rental car while his license was suspended, and he did not have car insurance. The Kennett Police Department's (KPD's) unwritten procedure under those circumstances required that the vehicle be towed. The towing procedure further required that an inventory search be conducted before the vehicle could be towed. During an inventory search of the rental car, more than 300 multi-colored pills containing methamphetamine, brown colored pills containing a cutting agent, 7.5 ounces of marijuana, and a large sum of cash was seized from the rental car.

Drake alleges that the KPD did not have standardized procedures for the search of the vehicle and that the officers had an investigatory motive in conducting an inventory search of

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

the rental car. (Doc. 23 at 4-6.) He requests suppression of the drugs and money seized from his rental car.

The Government originally countered that the search of the Mazda was pursuant to a lawful inventory search. (Doc. 25 at 6-9.) After the evidentiary hearing, the Government argued that officers had probable cause to search the Mazda based on the odor of marijuana and other factors. (Doc. 37 at 9-14.) Alternatively, the Government argues the search of the rental vehicle was a valid inventory search. *Id*. at 14-21.

In consideration of the pleadings and evidence submitted[2] by the parties along with the testimony[3] presented during the evidentiary hearing, the undersigned recommends that the following findings of fact and conclusions of law be adopted, and that the Defendant's Motion to Suppress Evidence be denied.

### I. Findings of Fact

Kennett Police Department (KPD) Officer Brandon Perkins was on his standard patrol route on June 5, 2023. Around 1:05 a.m., he noticed a black Mazda sport utility vehicle without the taillights turned on. Officer Perkins activated his emergency lights to conduct a traffic stop of the vehicle. Rather than stop, the driver continued to drive down Ely Street where Officer Perkins first observed him. The driver then turned onto Riggs Street and did not pull to the side of the road although there were multiple opportunities to do

---

[2] The exhibits submitted during the hearing included the tow form (Gov't. Ex. #1), Officer Perkins' body camera recordings (Gov't. Ex. #2), and Drake's agreement with Enterprise for the rental car (Def's. Ex. A). After the hearing, the parties agreed to the admission of Officer Ellison's and Officer Brewer's body camera recordings (Gov't. Ex. #3).

[3] *See* Hearing Transcript, Doc. 30, referred to herein as "Tr."

so on Ely and Riggs Streets. Instead, the driver drove on to the Maco Apartments where he pulled into the apartment complex parking lot and parked the Mazda. The operator of the Mazda was Defendant Timothy Drake. He was the only occupant of the vehicle.

Rather than await the officer's approach, Drake immediately exited the Mazda and walked directly to the driver's side of the patrol car. Officer Perkins advised Drake that his taillights were not on "when you was driving, man."[4] *See* Gov't. Ex. #2-1 at 00:00-00:002. Drake returned to the vehicle and turned the lights on, then walked back toward Officer Perkins as he was exiting the patrol car. Officer Perkins calmly noted, "[w]hen you was driving you didn't have no taillights." *Id*. at 00:10. Drake then continued moving toward Officer Perkins, the officer loudly ordered Drake to "[h]ave a seat back in the car." *Id*. at 00:14. While giving that order, Officer Perkins reopened the driver's side door of the patrol vehicle in an apparent attempt to put a barrier between himself and Drake.

Instead of obeying the commands, Drake faced Officer Perkins and pointed out that the taillights were on. Drake then asked, "[w]hat is the problem?" *Id*. at 00:20. Officer Perkins instructed Drake to return to his vehicle six more times while Drake continued asking questions and failing to return to the Mazda. During the fifth instruction, Officer Perkins directed Drake to "[h]ave a seat back in the car where I can finish up my traffic

---

[4] Officer Perkins and the backup officers (Brewer and Ellison) wore body cameras during the incident as required by KPD policy. Officer Perkins' body camera stopped recording after the 3 minute and 47 second mark when Drake was resisting the officers' efforts to place him in handcuffs. There is no evidence to support that Perkins intentionally turned his camera off. Doing so would have been futile as the other officers' body cameras were on and recording the interaction with Drake. That said, Officer Brewer's body camera eventually ran out of battery while he was at the scene. Sgt. David Bailey, who supervises the patrolmen, testified that after having reviewed the body camera footage for the incident there was no reason to believe that Officer Perkins violated the KPD's policies related to the use of body cameras. (Tr. 95.)

stop." *Id*. at 00:24.  Drake repeatedly asked "what's the problem" and ignored the officer's instructions.  The eighth time Officer Perkins issued the command, he loudly instructed, "[h]ave a seat!"  *Id*. at 00:48.

When Drake was finally returning to the driver's side door of the Mazda, he pointed out that his taillights were on, stated they were automatic, denied that the lights were broke, and claimed the officer was "tripping."  Drake continued talking in an apparent effort to talk himself out of being issued a ticket.  Although Drake had yet to open the driver's side door, Officer Perkins asked, "[o]kay,…you got your ID on you?" *Id*. at 00:42.  Drake began walking toward Officer Perkins again and debated whether there was a need for him to provide his driver's license.  Drake responded, "you already know my name, Perkins."  Officer Perkins replied, "[o]kay, let me see your ID, man."  Again, Drake refused and said, "you know my name, Perkins."  Officer Perkins stated, "[l]et me see your ID."  *See id*. at 00:45-00:53.

At this point, Drake not only returned to the Mazda, he opened the driver's door.  Rather than sit in the vehicle, Drake was standing in front of the driver's seat and reaching in the front compartment area.  His entire upper body was inside the Mazda.  Drake was in this position for nearly 30 seconds.  *See id*. at 00:55-01:20.

When Drake stood up, Officer Perkins said, "[o]kay, come here, Timothy." *Id*. at 01:20.  Drake then announced, "I don't have my ID on me." *Id*. at 01:23.  Next, Drake noticed the arrival of the backup officers Officer Perkins had called when Drake parked the Mazda.  He exclaimed, "[c]ome on, man--are you serious, man?"  *Id*. at 01:24.

Officer Perkins testified that when Drake opened the driver's door, he immediately noticed "a strong odor of marijuana emitting from the vehicle.  And it – I mean, just strong

from the distance I was at, the odor carrying to me and everything." (Tr. 15.) Perkins also testified that he "believed that it may be in the vehicle or Mr. Drake may have just possibly smoked some marijuana." (Tr. 79.) Based on a review of the body camera video, the odor carried the full length of the Mazda and an additional ten or so feet. Gov't. Ex. #2-1 at 00:55-01:20.

About the same time Drake noticed the backup officers, Drake positioned himself right in front of Perkins. Officer Perkins asked, "What's up, man--how much have you had to smoke tonight?" *Id*. at 01:25. Drake incredulously answered, "[w]hat the f---, bro?" This exchange followed:

Perkins:    I mean, man, I can smell the marijuana coming out of the car.

Drake:    What that got to do with anything? I'm not doing nothing wrong. Come on, man.

Perkins:    Oh, okay. I'm askin' how much,… (Drake turns his back on the officer and starts to walk away.) Hey, don't walk away, Timothy. Look--.

*Id*. at 01:30-01:40. Drake then turned to face Officer Perkins and with an authoritative voice stated, "Lights out, give me my ticket, man." Officer Perkins again asked, "uh, uh—okay, where--where's your ID at?" *Id*. at 01:43. Drake continued to walk around waving his arms and complaining about the stop.

Drake:    You know my name, run my name, man. What the hell?

Ellison:    He won't give his ID. He did the same thing to me the other day.

Drake:    I don't got no ID. Run my name.

Ellison:    You do have ID, you had it the other day, you gave it to me.

Drake:    God damn, man, you all crazy. Find somebody else--find something else to do, bro. Straight up. I am not the one.

*Id*. at 01:45-02:06.  Drake then turned around again, faced Officer Perkins, and pointed toward the Mazda with his cell phone in his outstretched right hand and said, "Write me a ticket for the damn whatever it is, headlights.  Whatever it is, man.  Do that."  *Id*. at 02:07.  Officer Perkins replied "okay," to which Drake responded, "Leave me the f--- alone."  *Id*. at 02:12.  Drake glared at Officer Perkins during his instruction to the officer and again turned his back on the officers.  Officer Perkins responded, "Okay, come have a seat in my car."  Drake adamantly refused the directive and stated, "I don't gotta have no seat in your car, bro. I don't gotta have no seat in your car. What the f---, you all crazy.  You all as crazy as hell." *Id*. at 02:14.  Officer Ellison advised Perkins that Drake's license was suspended and that he gave Drake a ticket for it the other day.

The conversation turned to whether Drake had insurance.  Drake responded that it was a rental and initially claimed he had insurance.  When Officer Perkins asked Drake to find his insurance, Drake replied "I don't gotta find no insurance for you."  *Id*. at 02:48. There was then a debate about whether Drake needed to show proof of insurance.  Drake was staunch in his position that he did not need to meet the officers' request for proof of insurance.  He continued to use expletives, walk around freely, and argued there was no need to provide insurance.  Officer Perkins calmly requested, "Well, hey, come over here and stand. Quit trying to walk off."  *Id*. at 03:12.

Drake aggressively faced Officer Perkins and exclaimed, "Give me a ticket for whatever you givin' me a ticket for," while waving his arms for emphasis.  *Id*. at 03:15. Officer Perkins replied with similar volume to Drake's voice and said, "well, hold on and I will."  *Id*. at 03:17.  Drake took it one step further and said, "that's all you gotta do Perkins.

Page **6** of **17**

You know your job, it's not hard." *Id*. at 03:19-03:22.  Drake was again in Officer Perkins' face in an apparent challenge to his authority.  In response to the escalation in Drake's behavior, the officers collectively attempted to place Drake in handcuffs.  Drake resisted the officers' efforts.  Officer Perkins administered pain compliance strikes to get Drake to cooperate. After that, Drake continued to resist the officers' attempt to secure him in handcuffs and they warned him if he did not comply, they would use a taser.  Drake did not stop resisting and a taser was deployed.

> Officer Perkins described Drake's behavior as follows:
>
> He was extremely agitated, refusing to obey commands and everything.  Basically, just being evasive to any questions we was trying to ask him on the stop.  He kept trying to walk off from officers and just seemed like he was trying to distance himself from the vehicle and from the officers on the scene.

(Tr. 19-20.)  Once Drake was handcuffed, Officer Perkins testified Drake was under arrest for No Operator's License[5] and Resisting Arrest.  (Tr. 24-25, 82.)

Shortly thereafter, the officers attempted to load Drake into a patrol car for transport to the jail.  As the officers guided him to the patrol car for transport, he claimed his legs were locking up and he could not get in the vehicle.  Drake was in fact locking his legs so that the officers could not get him into the patrol car.  Drake also claimed that he could not breathe.

Based on Drake's report that he couldn't breathe, Officer Perkins called medics to the scene around 1:13 a.m.  (Tr. 26.)  Drake complained about the amount of force that was used against him, claiming that the officers had beat him up.  The medics examined Drake and took his blood pressure.  Drake's family members arrived, and they were allowed to interact

---

[5] Although Officer Perkins stated one of the charges was for No Operator's License, he later corrected himself and confirmed the traffic violation was for Driving While Suspended.  (Tr. 42.)

with Drake to assist in calming him down.  Drake was crying and hugging a family member while the family member comforted him.  Drake's behavior was very dramatic.  A supervisory officer on the scene commented to one of Drake's relatives that perhaps Drake was under the influence.

By approximately 1:15 a.m., Officer Perkins called for a tow truck.  He testified this was necessary because the driver of the vehicle had been arrested.  Furthermore, the vehicle was not insured, which meant that no one could lawfully drive the Mazda.

The KPD has no written procedure regarding towing of vehicles when the driver is arrested.  Officer Perkins testified that when a vehicle is towed, an inventory search is completed "to list any property that may be in the vehicle in case they say, Hey, we had a Rolex or something like that, and it comes up missing."  (Tr. 29.)  A Crime Inquiry and Inspection Report/Authorization to Tow form is used to document the items left in the vehicle.  It's a Form 4569 from the Missouri Department of Revenue, Motor Vehicle Bureau.

Sgt. David Bailey who supervises the KPD Patrolmen further explained:

> Our procedure is pretty much if the vehicle is going to be towed under an arrest for a criminal offense, and the vehicle cannot be released to anybody else, then that vehicle will be towed.

(Tr. 91-92.)  Sgt. Bailey added that officers have discretion to release a vehicle to another authorized driver if someone else is "able to legally drive that vehicle,…" (Tr. 92.)  He also confirmed that if a vehicle is towed, "an inventory search should be completed along with the proper paperwork." *Id*.  Sgt. Bailey also agreed that when a driver cannot provide proof of insurance, their vehicle will always be towed. (Tr. 93.)

When Officer Perkins completed the tow form for the Mazda, as to the "Reason for Removal," he marked "other" and "custodial arrest." *See* Gov't. Ex. #1. The form noted Timothy Drake as the owner along with EAN Holdings as the registered owner. Drake submitted the lease agreement he had entered with Enterprise during the evidentiary hearing. *See* Def's. Ex. A. The items listed on the tow form were identified as "hats, personal mail, spare tire."

The search of the Mazda began around 1:20 a.m.,[6] while medics were still attending to Drake. Officer Perkins discovered contraband during his search of the Mazda in plastic bags located underneath the front passenger seat. The plastic bags[7] contained more than 300 multi-colored methamphetamine pills, brown colored pills containing a cutting agent, 7.5 ounces of marijuana, and a large sum of money. Between the several thousand dollars of cash found in Drake's pants pocket and the additional money found throughout the vehicle, a total of $20,284 was seized. The drugs and money were not listed on the tow form since those items were seized as evidence.

When all the items were placed together in the driver's seat, Officer Perkins questioned whether an item should be seized, which the undersigned inferred as referencing the marijuana. The officer who responded noted that "if it could be a federal case, you may go ahead." *Id*. at 01:15. A second officer, who was referred to as "Major," stated that if it

---

[6] During the evidentiary hearing, Drake's counsel commented that the time stamps on the body camera videos were off by about 25 minutes, because they were inconsistent with the timeframe reflected in the police report. (Tr. 46.) Defense counsel's assessment appears to be accurate thus the timeframes reflected in the "Findings of Fact" are based on testimony during the hearing, or estimations based on the testimony and the body camera video timestamps reduced by 25 minutes.

[7] *See* Gov't. Ex. #2-2 at 00:04.

Page **9** of **17**

wasn't used the marijuana could be returned. Although recreational use of marijuana is lawful in Missouri by adults 21 years of age and older, Missouri Amendment 3 limits recreational consumers to possessing no more than 3 ounces of marijuana in any setting. *See* Mo. Const. Art. XIV, § 2.10(1.a.). Thus, possession of more than 7 ounces of marijuana by an individual is unlawful under Missouri law.

Body camera footage from the evening shows that the customary tools that accompany a spare tire were also in the spare tire compartment. *See* Gov't. Ex. 2-2 at 02:10-02:27. A paper McDonald's beverage cup and a metal mug were in the center console cupholders, there was an empty plastic bottle in the passenger seat, as well as a pack of Kool cigarettes in the center nook in front of the gear shift. Officer Perkins referred to those items as "trash" and he commented that cash was strewn throughout the vehicle. *Id*. at 0:00-01:53.

As for Drake's condition, the first responders noted that his blood pressure was a little high. Drake continued to carry on, crying and complaining that the officers tased him. While this was happening, Officer Perkins spoke to another officer about who would transport Drake to the hospital. He asked whether Officer Perkins might release Drake and apply for an arrest warrant. Officer Perkins agreed that he would probably do that. *Id*. at 05:35-05:45.

The medic's assessment was that Drake was "confused." *Id*. at 06:22. He also noted that Drake "won't answer any questions, at all. He keeps saying the same thing over and over." *Id*. at 06:32. The questions included whether Drake wanted to go to the hospital. Officer Perkins approached the group and repeated the medic's question about whether he wanted to go to the hospital noting it was a "simple yes or no question." *Id*. at 6:40. Shortly thereafter, at approximately 1:27 a.m., Officer Perkins removed the handcuffs from Drake's

wrists. *Id*. at 07:10.  The medics continued to offer Drake support. In the end, Drake refused to be transported to the hospital in the ambulance.

When Officer Perkins returned to the Dunklin County Detention Center, he sought an arrest warrant for Drake including charges for Possession of a Controlled Substance, Driving While Suspended, and Resisting Arrest.  (Tr. 42, 81.)

Drake requests suppression of the drugs and money found during the inventory search of the rental car.

## II.  Discussion

First, Drake did not challenge the validity of the traffic stop.  As noted by the Government, Officer Perkins' body camera confirms that the Mazda's lights were not illuminated when Drake pulled into the parking lot.  (Doc. 25 at 6.)  After Perkins advised Drake the lights were not on, Drake returned to the vehicle and turned them on.  *See* Gov't. Ex. #2-1 at 00:00-00:14.

Drake claims that the KPD towing procedure was inadequate, and the inventory search of his rental car was unlawful.  (Doc. 32-1 at 10.)  He also argues there are multiple indications that Officer Perkins' search of the rental car was "part of a 'fishing expedition.'" (Doc. 23 at 4.)  First, Drake notes the decision to tow the vehicle occurred within less than 15 minutes of the stop, and the "officers can be heard commenting on the possibility that prosecution could be brought based on the items discovered." *Id*. Next, Drake argues that his family members arrived on scene before the tow truck, and the tow was not conducted pursuant to a custodial arrest as noted on the tow form.  Plus, multiple family members who were present at the scene could have moved the vehicle which was "lawfully parked in the

Page **11** of **17**

apartment building lot." *Id*. at 6.  Drake argues that "the inventory-search banner" was raised to "justify a simple investigatory search for incriminating evidence." Doc. 32-1 at 10, citing *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003).  Drake states that "[t]he key issue is whether KPD had impoundment procedures in place and, if so, whether those procedures sufficiently guided the exercise of Perkins' discretion." *Id*. at 13.  He also claims that "Perkins exceeded the scope of the inventory search policy when he opened the bag found on the car's right rear floorboard." *Id*. at 17.  Finally, Drake notes that Officer Perkins did not list all the items found in the rental car such as a thermos found in the front seat and tools that were located next to the spare tire, and thus the KPD inventory procedure was not followed. *Id*. at 18.

      The Government responded that "[a]lthough the KPD's standardized procedures for conducting an inventory search pursuant to tow has not been reduced to writing, the routine practice of the officers was followed in this case and justified the vehicle search." (Doc. 37 at 18.)  The Government further observed that "even though Drake was later released at the scene, law enforcement could not release the vehicle back to him due to his suspended operator's status." *Id*.  Next, the Government responded that although "the officers may have been curious as to whether they would find contraband in Drake's rental car, speculation was certainly not the purpose for searching the vehicle before it was towed per the KPD's standardized policy." *Id*. at 19.  As to Drake's allegation that Officer Perkins failed to list all items found during the inventory search, the Government counters that whether the thermos and spare tire tools were overlooked or not deemed to be an item of value "does not equate to a deviation from the KPD inventory procedure." *Id*. at 20.  Lastly,

it argues "[u]nder the totality of the circumstances, the search of the rental vehicle was reasonable and lawful pursuant to the inventory exception to the warrant requirement." *Id*.

Finally, both parties discuss the automobile exception to the warrant requirement in their Post-Hearing briefs.  (Doc. 32-1 at 19-23; Doc. 37 at 12-14.)  That said, Officer Perkins did not testify that the odor of marijuana provided him with probable cause to search the Mazda.  Thus, the undersigned will not consider whether the automobile exception applies.

As discussed below, the inventory search of the vehicle was according to law and constitutional.

## II.A.  Inventory Search

Generally, searches conducted without prior approval from a judge are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted).  Among the exceptions to the warrant requirement is an inventory search.  *United States v. Taylor*, 636 F.3d 461, 463-64 (8th Cir. 2011).

The Supreme Court has recognized that a police officer, carrying out community caretaking or administrative duties unrelated to criminal investigations, may sometimes be required to search private property that has lawfully come into official custody." *United States v Rabenberg*, 766 F.2d 355, 356 (8th Cir. 1985) (citing *Illinois v. Lafayette*, 462 U.S. 640 (1983).  "[I]t is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Lafayette*, 462 U.S. at 648.  The Eighth Circuit explained:

> The purpose of an inventory search is to protect the "owner's property while it remains in police custody," as well as to protect "police against claims or disputes over lost or stolen property" and "from potential danger[s]." *South Dakota v. Opperman,* 428 U.S. 364, 369, … (1976). An inventory search must "be reasonable under the totality of the circumstances . . . and may not be a ruse for general rummaging in order to discover incriminating evidence." *Taylor*, 636 F.3d at 464 (internal quotation marks omitted). "The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime." *Id.* (Internal quotation marks omitted). However, inventory searches need not be conducted in a totally mechanical, all or nothing fashion." *United States v. Garreau*, 658 F.3d 854, 858 (8th Cir. 2011) (internal quotation marks omitted). And, "[e]ven when law enforcement fails to conduct a search according to standardized procedures, this does not mandate the suppression of the evidence discovered as a result of the search." *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003). "There must be something else; something to suggest the police raised 'the inventory-search banner in an after-the-fact attempt to justify' a simple investigatory search for incriminating evidence." *Id.* (quoting *United States v. Marshall*, 986 F.2d 1171, 1175 (8th Cir. 1993)).

*United States v. Smith*, 715 F.3d 1110, 1117-18 (8th Cir. 2013).

The Second Circuit in *United States v. Mendez*, articulated:

Under the inventory search doctrine, we have held that "law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to 'standardized criteria … or established routine.'" "The existence of such a valid procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices."

A valid inventory search routine may allow the searching officers "sufficient latitude to determine whether a particular container should or should not be opened, but "[t]he individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" In short, "[t]he policy or practice governing inventory searches should be designed to produce an inventory."

315 F.3d 132, 137 (2d Cir. 2002), (internal citations omitted).

Any inference of investigatory motive is typically vitiated when police conduct the inventory search in accordance with department policy. *United States v. Marshall*, 986 F.2d

Page **14** of **17**

1171, 1174 (8th Cir. 1993).  An officer's mere suspicion that evidence may be discovered during an inventory search does not itself render the search investigative.  *United States v. Porter*, 859 F.2d 83, 85 (8th Cir. 1988) (per curiam).  Courts will uphold an inventory search as proper even if it does not precisely conform to department policy so long as "it is not a pretext for an investigatory search."  *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011).  Ultimately, "[t]he central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable."  *United States v. Kennedy*, 427 F.3d 1136, 1143 (8th Cir. 2005).

The Eighth Circuit has rejected the notion that an inventory search must be "totally mechanical" to pass constitutional muster.  *See United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004).  As noted above, it is not necessary for inventory searches to "be conducted in a totally mechanical, all or nothing fashion."  *See Garreau*, 658 F.3d at 858.  In fact, failure to conduct a search according to standardized procedures does not automatically render an inventory search unreasonable.  *See United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998).  Nor is it necessary for the procedure to be in writing.  *United States v. Lowe*, 9 F.3d 43, 46 (8th Cir. 1993) (noting that the Fifth and Seventh Circuits have rejected arguments that written procedures must be submitted to establish compliance with automobile inventory policies).

The KPD standardized procedures for conducting an inventory search when a vehicle is towed has not been reduced to writing.  The standard practice, however, requires that when a driver is arrested and a qualified driver is not present, the vehicle operated by the driver must be towed.  The standard practice further requires that prior to towing the vehicle, an inventory of the vehicle must be completed to memorialize what, if any, property remained

Page **15** of 17

in the vehicle.  Additionally, the KPD standardized procedure requires that vehicles that are not insured must be towed.

In this case, the items seized were not listed on the tow sheet as they were secured as evidence.  Officer Perkins noted that hats, personal mail, and a spare tire remained in the Mazda.  The fact that neither the spare tire tools nor items such as a paper beverage cup, empty plastic bottle, thermos, and pack of cigarettes were not listed does not render the search of the Mazda unreasonable.  Officer Perkins generally adhered to the KPD standardized procedure by documenting the contents of value located within the Mazda via the tow form and his body camera.  To effectively document the contents, Officer Perkins looked inside the shopping bags within which the drugs and a large portion of the money were located.

The fact officers believed evidence of a crime would likely be found in the Mazda does not invalidate the inventory search.  Certainly, Drake's extreme behavior in response to a simple traffic stop gave the officers reason to believe he was hiding something in the Mazda.  Drake's unusual behavior makes more sense considering the fact he had more than $20,000 between the money in his pocket and the cash found throughout the vehicle, along with over 300 pills containing methamphetamine and 7.5 ounces of marijuana. Drake was arrested for Resisting Arrest and Driving While Suspended roughly 10 minutes before the inventory search.  He did not own the Mazda, a rental vehicle.  There was no qualified driver present who could take possession of the vehicle as there was no car insurance for the Mazda.  The tow truck was called before the inventory search was conducted.  No evidence supports Drake's position that the inventory search was "an after-the-fact attempt to justify a

simple investigatory search for incriminating evidence." The officers had a lawful reason to tow the vehicle which necessitated the inventory search.

Based on the foregoing analysis, the search was reasonable under the totality of the circumstances. Drake's request for suppression of evidence should be denied.

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence (Doc. 23) be **denied**.

Further, the parties are advised that they have until not later than July 23, 2024, in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

/**s**/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of July, 2024.